We want to welcome everybody here this morning. Thank you for being at the 11th Circuit on our first day of this Oral Argument Week. We're going to hear four cases today, but before we get started, a couple of things. First of all, Judge Luck and I are very pleased to have Judge Schlesinger joining us today. We thank him for his contribution to helping us to get our work done. And for those of you who have not been here before, we operate on a traffic light system. And so you will see we have the red light, the green light and the yellow light. The yellow light will go on when you have two minutes. That means just start paying attention to the end of your time. And when the light is red, it means finish the sentence, not the claim, not the issue, unless of course we are asking questions and then we will let you proceed. The first case that we have this morning is United States of America v. Malachi Mullings, 24-11822. And Mr. Finlayson, if I'm pronouncing that correctly, you may proceed and I see that you have reserved five minutes for a rebuttal. That's correct. Lee Finlayson for Malachi Mullings. Good morning. Malachi Mullings was sentenced to 120 months for laundering money for a fraud group. His roommate, CJ, received a year and a day for doing the same thing for the same group of people. He was prosecuted in Maryland. Mr. Mullings was prosecuted here. Two of the fraudsters who committed the underlying frauds were sentenced to 36 months and 60 months also in Maryland. This case was brought by Maine Justice out of D.C. Again, Mr. Mullings was the only one prosecuted here in the Northern District. Mr. Mullings' sentence was procedurally unreasonable and it was substantially unreasonable. But before we cover those issues, I really want to ask the question of sort of why are we here or why wasn't this stopped? Because the most important thing I think I would like to discuss today is that Mr. Mullings should have been allowed to withdraw his guilty plea. He presented fair and just reasons to the District Court within a very reasonable time of entering this plea. We should remember it took three times to get this plea entered. The first time they came to court, they all went home. No plea happened. The second time they came back, they couldn't get through a factual basis. There was a timeout. There was a heated conversation in the hallway. Mr. Mullings finally came back and was able to get through the plea colloquy. Just over a month later, Mr. Mullings moves to withdraw his plea. When we look at the buckles factors, United States versus buckles, there are four factors and there's also the issue in that case of timing of the motion to withdraw the plea. Here the timing is very clearly in Mr. Mullings' favor. It was barely over a month. There had been no pre-sentence report issue, no sentencing date or no sentencing of co-defendants. I think when we look at the case law around this area, there's the Pitts case that I cite in my brief where it was four months later was deemed, that's a tactical decision. The defendant is trying to game the system by waiting this time and trying to get a better deal. What about the fact that you argue that the revocation of your client's bond has no bearing on the validity of the motion to withdraw? Why shouldn't we draw an inference that serving a week of incarceration prompted his motion to withdraw? Well, there's several reasons, Your Honor, and good question. The fact is, he was going to prison regardless. He was never going to get probation. So to suggest, oh my, suddenly I've gone to jail and now I don't like jail, so therefore I'm going to withdraw the plea, this is not gamesmanship. He got access to a law library and some advice in the jail. So that's, I don't think that cuts against us. I know the government has argued that, but I think it's a red herring. I don't believe that cuts against us in any way. He could have moved just the same from out on the street and it would have been a perfectly appropriate claim. Furthermore, if anything, being in the jail further delayed his ability to bring that claim or to file the motion to withdraw the plea. You also argue that because it took sort of some fits and starts to get his guilty plea entered, that that works to your client's favor under Buckles. But doesn't, especially if we look at the district court's opinion and we look at the transcripts, doesn't that actually show that the district court took its time, made sure at each and every turn that your client had the opportunity to contemplate whether he was going to enter this guilty plea, and really created a record that makes it so it's very difficult for your client to withdraw the plea? Well, I agree it created a record. Now, whether or not it's an authentic reflection of my client's state of mind at the time, I think we've all been, or maybe we haven't all been, but I know I've been in that situation where a client is trying to get through a guilty plea, and his lawyer in the hallway is telling him, you've got to answer the questions the right way or this plea is going to get rejected and you're going to get slammed. And that is a harsh reality of that dynamic. And there was not close assistance of counsel here, and that's one of the Buckles factors, is whether or not there was close assistance of counsel. Counsel and the client were at odds from day one. Sadly, Mr. Malloy was very ill, and that wasn't disclosed when he hired, when Mr. Mullings hired Mr. Malloy. But sadly, that relationship was never good. Mr. Mullings was not happy with his lawyer. But in fact, your client then hired a second attorney. So he has two attorneys not associated with the same firm, as far as I can tell. And they both testified, and their testimony was similar. And in fact, the court found that their testimony was credible, whereas your client's testimony to the contrary was not. What are we supposed to make of that? A couple of things. You're right. He did hire a second counsel. Attorney Temple came in very late in the game. This was after all of the debriefing fiascos had happened. So you have to, you know, one of our issues, too, is the government failed to disclose this cooperate, the guilty plea of CJ, which happened a year before Mr. Mullings was ever even arrested. So that whole fiasco, and Mr. Mullings going with Mr. Malloy to be debriefed four times before he ever got to court, before Ms. Temple ever got into the game. What law requires the prosecutor to disclose the statement that inculpates rather than exculpates your client? Well, Your Honor, there's really four things at that, where that comes into play. And to be first candid. No, but I'm asking you what requires the disclosure. It would be great to have it. But is there anything that forces the government? It's not Brady material. Well, that's, I would submit it is. And that's a little bit of a hard sell. But I would submit that it was, it does touch on Brady because there's a couple of ways that information could have been flipped. One is, it would have, had it been disclosed in a timely fashion, Mr. Mullings never would have sat down with the government and given four statements and basically sunk his own ship. He could have actually had a much better trial status. So that wouldn't have happened. But secondly, had he gone to trial, had that, had he never cooperated and spilled his guts, he could have then gone to trial and pointed the finger at CJ. So then it would have been exculpatory because we got somebody that's come in under oath and said, hey, I did this. I'm my, the room, not just some random person, the roommate, his own roommate said, I'm the one that was doing these crimes. So you could have pointed the finger there. So that would have made it Brady. Further, as I've raised it below, was it may have given rise to an entrapment defense depending on the timing. And the timing is a little fuzzy in there because I, we realize now that CJ pled guilty a year before Mullings was arrested. So exactly where his cooperation or, you know, there may have been an entrapment defense there as well, which we don't know because half of that record is sealed in Maryland, not here in my district, Northern District. Judge French, I feel like I didn't answer all of your questions. I can't remember the second half of it. Ms. Temple, oh, in the hallway, their testimonies, you know, their testimony about what happened in the hallway, they were both very vague about, couldn't remember exactly what happened. Mr. Malloy couldn't remember much of anything. Ms. Temple remembered there was an argument or a heated conversation at the table. She said Malloy gave him a steely look. She laid into him. She had never seen Mr. Malloy like this with Mr. Mullings. Clearly, something happened in that, in that break. And I think, I think we all know that there was, there was some heated words. If I had been the lawyer, there would be some heated words. There were some heated, you know, I think that's obvious, the fact that there was a 180-degree shift about the knowledge and the knowledge of the underlying source of the funds. Now, Mr. Mullings never denied that he deposited this money, but the sort of the sticking point at the earlier guilty pleas was whether or not, you know, whether he knew the source of the funds. He didn't commit the frauds. And this kind of leads into the sentencing issue, and I submit at the, at the sentencing, the district court mischaracterized the nature of the offense. The district court treated Mr. Mullings as if he were the one conning the little old ladies, in the judge's words. And he, as he was the ones committing those frauds. But didn't the district court, the district court did talk about the underlying fraud, but then the district court clarified that it would not overreact based on the underlying fraud. He did say that, yes. But obviously, we got a sentence of 120 months, where the co-defendant, the people that did the underlying fraud, that conned the little old ladies for years and took all the money from the hospital programs for ages and got millions, those people got half as much as Mr. Mullings. But the 120-month sentence is well below the bottom of the guidelines range of 188 to 235 months, right? It is, it is below, yes, Your Honor. However, when you look at the variances that have been given across the country in money laundering, I think when we look at sentencing disparity, I ask the court to look at my volume three of the appendix, which has my sentencing memo and all of those other sentences into it. My exhibit one from the sentencing hearing, which was a cheat sheet or a chart of those cases that shows the disparity. I'd also flag for the court, the United States Sentencing Commission quick facts talks about the average money laundering sentence was 62 months in 2024. That's the average money laundering sentence. So there is unwarranted disparity here in the sentences. When my client gets 120 months, even if you factor in the lack of acceptance and the judge gave him a two-year penalty for trying to withdraw the plea, you give him 60 months plus 24 months, 84 months would have been a reasonable sentence. All right. Thank you. Thank you. And you have time for rebuttal. Mr. Mendel. Good morning. May it please the court, Gabriel Mendel for the United States. Starting with the withdrawal of the plea, one thing that was absent from my colleague's discussion is the standard of review, which is, of course, abuse of discretion, which means it's not for this court to decide what it would do in the first place, but to decide whether the district court acted within its wide discretion. Here it did. It conducted a lengthy evidentiary hearing on Mr. Mullings' motion to withdraw his plea, made the appropriate credibility determinations, and then properly applied the Buckles' factors in a 30-page written order. The district court did not abuse its discretion when it found that Mr. Mullings had close assistance of counsel, as evidenced by his sworn statements at the plea and the testimony of both of his trial counsel, nor did the district court abuse its discretion in finding that the plea was knowing and voluntary. As it had found when it took the plea in the first place and observed Mr. Mullings both at the plea and at the subsequent motions hearing. As the court's questions indicated, the lengthy Rule 11 colloquy is evidence of the exceptional lengths that the district court went to to make sure that Mr. Mullings understood each count and desired to plead guilty to each count. Mr. Mullings' claims regarding a Brady violation are baseless. There's nothing exculpatory about these documents, and as the district court found, the government had turned over to Mr. Mullings, prior to his plea, the audio recording of Mr. Jackson's cooperation. So to the extent there was something he needed to know about what his co-conspirator had told the government, he was in possession of that recording and the report. What was turned over after his plea were the proffer agreement, the plea agreement, the cooperation agreement, because those arguably are impeachment materials that if the government called the co-conspirator at sentencing, Mr. Mullings needed to have if he wanted to attack the reliability or credibility of the co-conspirator. Of course, as it turns out, that didn't matter because in the PSR, paragraphs 32, 33, and 34, Mr. Mullings admitted all of the conduct of the co-conspirator, including that he had recruited and directed his activities. And hasn't the Supreme Court in United States v. Ruiz said the Constitution doesn't require the government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant? Yes, Your Honor. That's exactly what the Supreme Court said. And then turning to the notion that there's an unwarranted sentencing disparity, first of all, this Court's precedent is very clear. You need to compare apples to apples. You don't cite nationwide averages. You don't cite other defendants. I'm not sure how many of these defendants were actually put before the district court, which is one issue. But most importantly, we don't have any apples to apples. We don't have anyone who committed this misconduct who then tried to get out of their guilt to plea, obstructed justice in so doing. The district court here weighed the 3553A factors, heard the testimony from the victims, as the Court's questions indicated, recognized that Mr. Mullings didn't personally defraud these victims. But in particularly, the business of money laundering enhancement, that four-point enhancement, the reason that exists and what the Sentencing Commission said that was for is that if someone is in the business of laundering money, they are incentivizing the fraudsters in the first place because those fraudsters know I have somewhere I can go to clean my money, just like a professional fence in the theft context. And so by setting up this avenue for these fraudsters to clean their money, he was accountable, culpable for the fraud that happened. The district court did not abuse its discretion in varying, I think, at least five years below the sentencing guidelines and imposing a reasonable sentence. Unless the court has questions, we'd ask the court to affirm the convictions and sentence. Thank you. Thank you, Mr. Mindell. And Mr. Finlayson, you have five minutes for rebuttal. You know, the government argued in the sentencing as well, apples to apples, and I hear that a lot. And, you know, the question is, was there unwarranted sentencing disparity? To quote the late J. Owen Forrester, I would say, that dog don't hunt. And the fact is, we have apples and apples, and as I submitted to the district, maybe one apple is a little bigger than the other, but we clearly have apples to apples in this case. C.J., Mr. Cotes-Jackson, was Mr. Mullings' roommate. He did the exact same thing. He opened a trucking company. He accepted money from the fraud group. He laundered that money. He pulled that money out. Did he have a criminal history category of three? He did not have a criminal history category of three. That seems like a pretty big apple. It moves the apple, but in no way does it move it from a— How about lying to the district court? Did he do that? He didn't—I have no idea because I can't see— That's an even bigger apple. I can't see the transcript. Did he get a 5K? He did get a 5K, yes, sir. And we can measure for all of those things. If you look at what we have, the documents and the record, you can factor all of those things. And we must remember, Judge Brown, the district court, said a two-year penalty is appropriate for, if you want to say, lying to the district court and trying to withdraw the plea. So you stack two years on top of what Mr. Adewale got in Maryland, the person that actually stole the money, the man that engineered the fraud, that guy got 60 months and Mr. Mullings got twice as much. So if you want to—we can play with words. We can say, oh, it's not the same, but you can analyze what happened to each of those defendants. His fraud loss was different, right? Well, Mr. Ceejay, who got a year and a day, his fraud loss was two points lower. In fact, we submit that our fraud loss should be in the same— It's hard to say that it's apples to apples. And the reason people use that terminology is because it comes directly from the case law. It's hard to say that it's not apples to apples, where you have someone who cooperated and, as Judge Lessinger said, got a 5K, who lied directly to the district court, so someone who didn't cooperate, lied to the district court, has a higher criminal history, had a larger fraud amount loss. How do you compare that? I—gladly. I think it's not—it's not 10 to 1. It is not—you can take out all those factors. Yeah, but this isn't science. No one says this is science. 355-3A is not—is not that. It's not science, but when you look—I mean, if—you know, I could understand the government's arguments. Like, you picked out a random defendant from Missouri who got sentenced for money laundering. You want to compare that? Sure. But here, I presented to the district court, the best I could, because you remember, half of this stuff is sealed in Maryland. I presented those underlying sentences, the plea agreements— But, counsel, let me be clear. You did a great job. You got your client a significant variance from where the guidelines were. You should be commended for your work. But our review, which is very deferential, requires us to say that if no judge could have reasonably determined, based on the various differences between the folks that you're talking about, that the sentences couldn't be different. And it seems to me, in looking at it, that we've identified four significant differences, that that is a reason why one would get a higher sentence than the other. And all I can say in response, Your Honor, is that it's—we're talking about labels here. To say it's not apples and apples, I think they are apples and apples, and all of those differences can be teased out. And if, you know, again, Judge Brown said two years for trying to withdraw the plea. For that, for losing acceptance—under the guidelines, losing acceptance and obstruction is a bigger swing. And Judge Brown thought it was—very clearly, two years. So you put that two years on top of five years, and you get to 84 months. And so— But you would recognize that if we find that the comparators in this case were not similarly situated, you're going to lose this argument, correct? Oh, I hate to say that. It doesn't help. I'll give you that. It doesn't help. And I would submit that they are the same fraud. And the one—another difference that we haven't talked about is the district court, and there is evidence in the record that your client directed CJ in this venture. I mean, so again, that sets up another apple. And CJ directed his own parents. CJ directed his own parents in Maryland. And CJ—CJ's getting revoked right now in Northern District of Georgia. CJ—that's all I got to say about that. They're apples—those are apples to apples. CJ directed his own parents, and they opened up bank accounts under their names. Money went into their accounts. He was—and if the loss amount—our loss amount issue, if we look at that, if I were correct and you rule in my favor, then they're in the same place, the same category for loss amount. And my client should be under the 3.5 threshold when the government brought in an auditor to say, oh yeah, these are the right numbers, but I don't know why these are the right numbers because I did not bring the underlying documents to court. You understand, though, that some of the things you've quibbled about with the amounts directly attributable to your client, even if we accept you—your argument is correct and wipe all of those out. If we think that the $1.2 million attributable to CJ is also attributable to your client, it doesn't matter for that. I disagree. I think we go under 3.5. Even if you bring in— But if you pull down—even if we add the $1.2—if we keep the $1.2 for CJ. You keep the $1.2, but you—the correct loss amount number, the most reliable number are the victim loss numbers in the pre-sentence report, and that's about $1.6 million. So $1.6—it had to be lower than that—$1.2 because it came in under $3.5. The victim loss numbers in the paragraphs that I've quoted in my brief and I've added them all up, that is—if you add that with CJ's $1.2, you do get under $3.5, and I'd ask the court to do that. All right. Thank you. Thank you, Judge. Thank you both for your argument today. We have your case under advisement.  And I'll go ahead and call the—